## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FREDERICK STAUDENMAIER,**

      **Plaintiff,**

**v.**                                 **CIVIL ACTION NO.: 5:19-CV-243**
                                               **(JUDGE BAILEY)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I.      INTRODUCTION

On August 15, 2019, Plaintiff Frederick Staudenmaier ("Plaintiff"), by counsel C. Richard Wilson, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On December 2, 2019, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On January 6, 2020, Plaintiff filed Plaintiff's Brief Setting Forward the Errors. (ECF No. 18). On February 5, 2020, Commissioner filed his Motion for Summary Judgment. (ECF No. 20) along with a Memorandum in Support of his Motion for Summary Judgment (ECF No. 21). Following review of the Motion by Commissioner and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge recommending the Defendant's Motion for Summary Judgment be **GRANTED**, and this matter be **DISMISSED WITH PREJUDICE**.

## II.    <u>PROCEDURAL HISTORY</u>

On February 21, 2017, Plaintiff filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on November 10, 2014. (R. 21). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2019; therefore, Plaintiff must establish disability on or before this date. (R. 21). This claim was initially denied on July 17, 2017 (R. 131) and denied again upon reconsideration on September 14, 2017. (R. 147). On October 2, 2017, Plaintiff filed a request for a hearing (R. 153), which was held before United States Administrative Law Judge ("ALJ") Karen Robinson on August 17, 2018, in Charlottesville, Virginia. (R. 44). Plaintiff, represented by counsel Michelle Manson, appeared via video from Cumberland, Maryland, and testified. James Primm, an impartial vocational expert, also testified at the hearing. (*Id.*) On September 24, 2018, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 35). Plaintiff filed a request for review of hearing decision dated September 26, 2018. (R. 203).

Subsequently, the Appeals Council issued a Notice denying Plaintiff's request for review. (R. 8). Plaintiff notified the Appeals Council of his intent to file in federal court but asked for Extensions of Time to File twice. (R. 7, 4). The Appeals Council granted Plaintiff's requests on August 5, 2019, making the deadline to file in Federal Court on or before September 9, 2019. (R. 1). Plaintiff filed his Complaint with this Court on August 15, 2019. (ECF No. 1).

## III.    <u>BACKGROUND</u>

### A.  Personal History

Plaintiff was born on November 24, 1980 and was 36 years old at the time he filed his DIB claim. (R. 205). Plaintiff completed schooling through seventh grade but did not finish eighth grade. (R. 46-47). Plaintiff's prior work experience included seasonal work at Walmart, an overnight stocking position at Ingle's Market, and a technician at Castrol Express Lube, later serving as an assistant manager for the company. (R. 47-52). Plaintiff was not married at the time he filed his initial claim, but he did have one child, Jonathan Staudenmaier. (R. 205-206). Plaintiff alleged disability based on back injury/slight bulging discs, arthritis, diabetes, depression, anxiety, high blood pressure, and high cholesterol. (R. 236).

## B.  Medical History

### 1.  Medical History Pre-Dating Alleged Onset Date of November 10, 2014

On July 8, 2014, Plaintiff received an examination by magnetic resonance imaging ("MRI") from Outpatient Diagnostic Center. The results of the MRI were interpreted by Dr. Jason B. Deen. Dr. Deen indicated that Plaintiff had very mild circumferential bulges of the lumbar disc as well as congenital spinal canal narrowing, which, when combined with the bulges of the lumbar disc, causes mild to moderate central stenosis. Dr. Deen also noted some early facet joints arthritic changes, resulting in relatively minor foraminal narrowing. (R. 323).

### 2.  Medical History Post-Dating Alleged Onset Sate of November 10, 2014

On January 22, 2015, Plaintiff visited Family Medicine West of Knoxville in Knoxville, Tennessee. (R. 330). An examination revealed that Plaintiff had a normal gait, pain with range of motion in the back, appropriate affect and demeanor, was alert and oriented, and had no focal deficits. (R. 331). Plaintiff was assessed with hyperlipidemia, a bulging lumbar disc, and chronic low back pain. (*Id.*). Plaintiff received refills of Perocet, Lisinopril, Tricor, and Diclofenac Sodium as a result of this visit. (*Id.*). Plaintiff had a similar visit with Family Medicine West of Knoxville

on February 19, 2015, in which Plaintiff was assessed with type II diabetes, essential hypertension, a bulging lumbar disc, chronic low back pain, and tooth pain. (R. 334). Plaintiff received a refill of Percocet and additional prescriptions for Flexeril and Amoxicillin. (*Id.*). Plaintiff had many similar visits, only adding a referral to a cardiologist and other medications for his back pain. (R. 29).

On August 7, 2016, Plaintiff visited the Emergency Room at Western Maryland Regional Medical Center. (R. 439). Plaintiff's gait was steady without ataxia, range of motion was within normal limits, had no focal neurological deficits, and reported no depression, anxiety, or hallucinations. (R. 440). On August 29, 2016, Plaintiff returned to the same Emergency Room with complaints of chest pain. (R. 453). Plaintiff denied any musculoskeletal pain, musculoskeletal weakness, or depression, but reported positive for anxiety. (R. 454). The examination showed Plaintiff was anxious and restless. (*Id.*). Plaintiff was diagnosed with chest pain, anxiety, and panic attack. (R. 456). On September 3, 2016, Plaintiff returned to the same Emergency Room with reports of anxiety and in need of a mediation refill. (R. 462).

On September 12, 2016, Plaintiff visited Rosario Family Health to establish a new primary care provider and obtain prescription refills. (R. 677). During this visit, Plaintiff reported backache and tenderness, and well as nervousness and depression. (*Id.*). Upon examination, Plaintiff was found to have 5/5 muscle strength in all major muscle groups and had a normal gait. (R. 678). Plaintiff was assessed with morbid obesity, HTN, anxiety, lumbago, and hyperlipidemia. (*Id.*).

On November 18, 2016, Plaintiff returned to the Emergency Room at Western Maryland Regional Medical Center after falling and hitting his head on the ground while playing with his child. (R. 471). Plaintiff complained of neck pain, back pain, and a headache. Upon examination, Plaintiff had no thoracic, lumbar, or sacral tenderness, but had paraspinal lumbar tenderness upon

palpation. (R. 473). Plaintiff's affect and mood were pleasant, and Plaintiff's thought content and process were normal. (*Id.*). Plaintiff was diagnosed with a head injury, cervical strain, and lumbar strain. (R. 474).

On November 14, 2016, Plaintiff visited Advanced Diagnostic Radiology in Cumberland, Maryland for an examination of both knees and his lumbar spine. No acute fractures or acute processes could be found, but the radiology report did note mild generalized degenerative changes in Plaintiff's left knee. (R. 431-3).

On December 9, 2016, Plaintiff underwent an examination at the office of Dr. Rosario Gonzaga. M.D., as part of a one-month follow-up on bloodwork and previous X-ray results. (R. 378). Plaintiff was assessed to have, in part, lower back pain, muscle spasm, and bilateral knee pain. (R. 379). An MRI was ordered, and Plaintiff was directed to take Metformin and Tramadol. (*Id.*).

Another examination on January 13, 2017, resulted in Plaintiff being assessed with obesity, lumbago, lumber radiculopathy, paresthesia, insomnia, and snoring. Plaintiff was prescribed Ambien and Neurtontin as a result of this visit. (R. 387). On March 27, 2017, Plaintiff was assessed with anxiety and depression, and was prescribed Clonidine and Paxil. (R. 391).

On May 24, 2017, Plaintiff visited New Creek Family Medicine, PLLC, and was examined by Dr. William Scott Thomas. (R. 508). During this examination, Dr. Thomas conducted a depression screening, which resulted in an assessment of generalized anxiety disorder, severe episode of recurrent major depressive disorder, and panic disorder with mild agoraphobia and moderate panic attacks. (R. 508-509). Dr. Thomas prescribed Paxil and Klonopin for Plaintiff as a result of this visit. (*Id.*). A follow-up visit with Dr. Thomas on June 14, 2017, resulted in an increase of his Paxil prescription. (R. 506).

An examination performed by Dr. Thomas on June 4, 2018, resulted in the same assessment noted above, with an added prescription for Wellbutrin XL to treat the severe episode of recurrent major depressive disorder. (R. 575). A Mental Medical Assessment completed by Dr. Thomas on the same date, June 4, 2018, concluded that Plaintiff was seriously limited or unable to meet competitive standards in categories of mental abilities needed to perform unskilled, semiskilled, and skilled work, including his ability to perform at a consistent pace without an unreasonable number and length of rest periods, and his ability to deal with normal workplace stress. (R. 751).

Plaintiff began visiting All Better Wellness Center Cumberland in Cumberland, Maryland, to be treated by Dr. Richard Habersat. (R. 894). On June 13, 2018, Plaintiff visited All Better Wellness Center Cumberland for an examination to be performed by Dr. Habersat. (R. 756). This examination resulted in diagnoses of a myriad of conditions, including, but not limited to, low back pain, chronic pain syndrome, spinal stenosis, and unilateral primary osteoarthritis of both the right and left knees. (R. 759-760). Plaintiff's treatment outlook stated that the prognosis for a complete recovery without any residual symptomatic flare ups is considered poor. (R. 767-768). Plaintiff became a regular patient of All Better Wellness Center for his pain management treatment.

### 3. Consultative Examinations

On June 8, 2017, Plaintiff underwent a consultative examination in Keyser, West Virginia, conducted by Greg Trainor, M.A., a licensed psychologist in the state of West Virginia. (R. 511). A clinical interview and mental status examination were conducted. (*Id.*). Plaintiff was also given WAIS-IV and WRAT-4 tests. (*Id.*). Plaintiff explained his conditions and his day-to-day life. (R. 512). Plaintiff was found to have his immediate, recent, and remote memories within normal limits. (R. 513). Plaintiff's concentration was found to be moderately deficient. (R. 514). Plaintiff's

6

WRAT-4 test results showed that Plaintiff had a spelling level equivalent to grade 3.7 and a math level equivalent to grade 5.2. (*Id*). Plaintiff was diagnosed with Specific Learning Disorder with Impairment in Written Expression, Specific Learning Disorder with Impairment in Mathematics, Mild Depressive Disorder, Unspecified Anxiety Disorder, and Mild Posttraumatic Stress Disorder. (R. 515). The psychologist determined Plaintiff's concentration was moderately deficient, persistence was within normal limits, pace was moderately deficient, immediate memory was within normal limits, recent memory was within normal limits, and Plaintiff appeared to be capable of managing his benefits should benefits be awarded. (R. 516).

On June 28, 2017, Plaintiff had a consultative examination performed by Stephen Nutter, M.D., in Romney, West Virginia. (R. 521). Plaintiff reported constant lower back pain, as well as constant joint pain in his knees, ankles, and left hip. (*Id.*). Dr. Nutter found Plaintiff to have a normal gait and to be comfortable in the sitting position but not in the supine position. (R. 522). Plaintiff's grip strength was diminished for his age. (R. 523). Dr. Nutter found that Plaintiff had tenderness in his paraspinal muscles, cervical spine, and left hip, and Plaintiff's straight leg raise test was limited to thirty degrees on the right and forty degrees on the left due to back pain. (R. 523-524). Dr. Nutter also found that Plaintiff was unable to squat due to knee pain. (R. 524). Dr. Nutter's impression was that Plaintiff was experiencing chronic lumbar strain and arthralgia. (*Id.*).

### C. Testimonial Evidence

Plaintiff was born on November 24, 1980 and was 36 at the time he filed his DIB claim. (R. 205). Plaintiff completed seventh grade and started eighth grade but did not complete his eighth-grade year. (R. 47). Plaintiff's previous work experience included serving as an overnight stocker at Ingle's Market, a seasonal worker at Walmart, and most recently serving as an oil

technician and assistant manager at Castrol Express Lube. (R. 48-50). Plaintiff was unmarried at the time of filing his DIB claim and had one son. (R. 205-206).

The ALJ asked Plaintiff why he believes that he is disabled and can no longer work:

ALJ:   Now why do you feel as though you're disabled and unable to work?

P:   I mean I have a hard time walking or standing maybe more than about ten to fifteen minutes at a time. It hurts to try and bend over and pick up something, sometimes I lose feeling in my hands and I just go to try and pick up something and I drop it. I'm usually not able to be up on my feet for no more than about ten to fifteen minutes. My knees with the arthritis is very painful to be, to be up and move around that long, and sometimes honestly sitting for long periods of times hurts just as bad.

ALJ:   And do your mental health problems affect your ability to work?

P:   Yes, ma'am. It's hard to be, hard to be around people. I find myself in a deep enough depression sometimes to where I close myself in my room for hours at a time, and then the anxiety, a lot of times I get anxiety just leaving my house. If I go out anywhere, if we have to go to the grocery store, me and my girlfriend helps me and we try to do it in the middle of the night, that way there's not as many people around and sometimes I still have problems with it.

ALJ:   And do you have any problems with memory?

P:   Sometimes, yes. It's not the, it's usually the, somebody tries to give me instructions a lot of the times I'm ten minutes late or I've forgotten.

ALJ:   And do you ever have any problems understanding instructions?

P:   Yes, I have a comprehension problem, I don't always understand things. Sometimes you have to go over it three or four times before it actually sinks in. I've had that problem since I was in elementary school.

ALJ:   And do you have any problems with focusing or paying attention?

P:   I'm sorry, focusing or paying attention?

ALJ:   Yeah.

P:   A lot of times what happens I really can't get, just an example, watching a movie I have a hard time staying focused on that, I lose interest in it or I just I don't try, I can't focus on one thing. My mind is usually going three different ways thinking about different things.

8

(R. 51-53).

Plaintiff was then questioned by his attorney to clarify the facts. Plaintiff testified that he had lower back pain that would radiate to his legs, causing his legs to feel as though they are on fire on an almost-daily basis. (R. 54). Plaintiff testified that he had osteoarthritis in both knees. Plaintiff also stated that doctors had told him that he is too young to have surgery on his back or knees. (R. 55). Plaintiff also testified that he had been experiencing issues with his shoulder. (R. 56). Regarding his mental health, Plaintiff testified that a combination of depression and anxiety would cause him to lock himself in his room for up to fix or six hours two or three times a week. (R. 58-59). Plaintiff further testified that he had recently passed out twice as the result of panic attacks, and he had also blacked out four or five times. (R. 60-61).

### D. Vocational Evidence

Vocational expert James Primm also testified at the hearing. Mr. Primm characterized Plaintiff's past work as an auto technician as medium work, semi-skilled, with a specific vocational preparation ("SVP") level of four. (R. 63). Mr. Primm then characterized Plaintiff's past work as an assistant manager as light work, performed at light to medium, skilled work, SVP level six. (*Id.*) Lastly, Mr. Primm characterized Plaintiff's past work as a stock clerk as heavy work, semiskilled, SVP level four. (*Id.*). With regards to Plaintiff's ability to return to his prior work, Mr. Primm gave the following responses to the ALJ's hypothetical:

> ALJ:   Now I have a few hypothetical questions for you. I'd like for you to assume a hypothetical person with the same age, education, and work history as the claimant. I want you to also assume that the person can perform light exertional work except the person can occasionally push, pull and operate the controls with both lower extremities. The person can occasionally reach overhead, frequently handle and finger, occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds. Occasionally balance and stoop, never kneel, crouch and crawl, the person may have occasional concentrated exposure to extreme heat and cold, wetness, humidity, vibration, fumes, odors, dust, gases and poor ventilation, but no exposure to work place hazards. Also assume that the hypothetical person can

perform low stress, unskilled work involving simple instructions, simple tasks and simple decisions. The person cannot perform work at a production rate pace involving commuter belts or assembly lines, also no work in large crowds or requiring interaction with the general public, and finally the person can adapt to occasional changes in work setting and work task. Can this hypothetical person perform the claimant's past work?

VE:   None of the past work, Your Honor.

(R. 62-64). Incorporating the above hypothetical, the ALJ then questioned Mr. Primm regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels. Finally, the ALJ questioned Mr. Primm about Plaintiff's ability to work if he is completely credible as to the severity of his condition:

ALJ:   And for each of the previous hypothetical how would your testimony change if the person required extra time to complete tasks or to obtain additional guidance or – on instructions?

VE:   Your Honor, it would be my vocational opinion on the DOT does not specifically address this issue or matter, that if an individual required frequent or more than one-time per hour redirection or additional support to complete these unskilled tasks that that individual would be unable to maintain work in a competitive labor market and would require the use of a job coach or work within a sheltered environment.

ALJ:   And what are the normal work place breaks and the employer tolerance for being absent from work or off task?

VE:   Your Honor, these issues are not addressed in the DOT, however, it's my vocational opinion that should have been to require, I'm sorry, Your Honor. The additional, the regular breaks are a 10 to 15-minute morning and afternoon break with a lunch break ranging from 30 to 060 minutes. An individual is expected to remain on task 90% of the workday in addition to the standard breaks that are previously mentioned, Your Honor. Should an individual be off task more than 10% throughout the workday all work for the national economy would be eliminated. In regards to absenteeism, Your Honor, based on information I've reviewed from the Bureau of Labor Statistics, as well as information contained in a national human resource survey should an individual miss more than one day per month on a regular basis it's my vocational opinion that that individual would be unable to maintain any level of full-time work this would eventually violate the attendance policies in competitive work in the work place.

10

(R. 66-67). After a brief statement from Plaintiff's attorney, the ALJ concluded the hearing.

**E. Disability Reports**

A disability report form dated April 6, 2017 listed Plaintiff's conditions as: back injury/slight bulging discs; arthritis; diabetes; depression; anxiety; high blood pressure; and high cholesterol. (R. 236). The medications Plaintiff was taking at that time included Ativan for anxiety; Lisinopril for high blood pressure; Oxycodone for knee and back pain; and, Paxil for depression. (R. 238).

In a subsequent disability report dated August 8, 2017, Plaintiff updated the list of medications to include: Clonazepam for anxiety; Crestor for high cholesterol; Diclofenac for pain/inflammation; Lisinopril for hypertension; Metformin for diabetes; Niacin for high cholesterol; Oxycodone for pain; and, Paxil for depression. (R. 259).

A final disability report dated October 4, 2017 added Tizanidine for muscle spasms and Glipizide for diabetes to his listed of medications. (R. 284, 286).

**F. Lifestyle Evidence**

In an Adult Function Report dated May 2, 2017, Plaintiff reported that he could not stand for more than ten to fifteen minutes at a time due to back pain, that anxiety and depression kept him from being around people, and that his knees also kept him from being able to stand for long periods of time (R. 243). Plaintiff stated that would usually sit for most of the day unless he had to do something for his son when Plaintiff's girlfriend was not present. (R. 244). Plaintiff would sometimes cook for his son and change his son's clothes. (*Id.*). Plaintiff's girlfriend would bathe and feed their son. (*Id.*). Plaintiff reported that his back and knee pain kept him from sleeping. (*Id.*).

Plaintiff reported that he would make frozen meals when his girlfriend was not present. He would have to make these meals at least once a day, and it would take him thirty to forty-five minutes to make one meal. (R. 245). Plaintiff reported that, due to his conditions, he now has to prepare his frozen meals in the microwave. (*Id.*). Plaintiff's girlfriend performed most of the indoor and outdoor chores and that he does laundry when he can, but it usually takes him a few hours to complete. (*Id.*).

Plaintiff reported that he would visit with his family once per week and would go to church every Sunday. (R. 247). Plaintiff also reported not enjoying his hobbies and interests as much as usual. (*Id.*).

When asked for how long he could pay attention, Plaintiff responded that he could pay attention as long as needed. (R. 248). He also said that he could follow spoken instructions well, as long as he could write them down. (*Id.*). Plaintiff reported that he did not handle stress very well, could handle changes in routine "somewhat OK," and had noticed fearing leaving his house and being around a lot of people. (R. 249).

Plaintiff wore glasses and had to use an electric scooter to cover long distances. (*Id.*). Plaintiff reported taking the following medications without experiencing any side effects: Ativan; Lisinopril; Paxil; Crestor, and; Metformin. (R. 250).

On an Adult Function Report dated August 16, 2017, Plaintiff reported multiple changes in his condition. First, he reported that he would awaken multiple times per night due to pain. (R. 263). He stated that he needed to be reminded to take his medication at the appropriate times. (R. 264). He reported that his mother and girlfriend prepare most of the meals, but he would prepare food two to three times per week. (*Id.*). He also reported that his brother would perform the outdoor chores around the house, he would help with laundry as much as he could, and his mother and

girlfriend would take care of everything else. (*Id.*). Plaintiff would spend time with family every

day, but had no other social activities. (R. 266-267). Plaintiff was prescribed a back brace in August

2017. (R. 268).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an

adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. *Id.*

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since November 10, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3. The claimant has the following severe impairments: lumbar degenerative disc disease, facet arthritis, stenosis, and congenital narrowing; chronic lumbar strain; cervical strain, arthralgia; left knee degenerative joint disease, bilateral ankle valgus deformity; diabetes, hyperlipidemia, hypertension, obstructive sleep apnea, chronic pain syndrome, obesity, specific learning disorder with impairment in written expression and mathematics; depressive disorder, anxiety disorder, panic disorder with agoraphobia and panic attacks, and post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functioning capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional push/pull and operate foot controls with the bilateral lower extremities; occasionally reach overhead; frequently handle and finger; occasionally climb ramps and stairs; never climb ladders/ropes/scaffolds; occasionally balance and stoop; never kneel, crouch, and crawl; occasional concentrated exposure to extreme heat/cold, wetness, humidity, vibration, fumes/odors/dusts/gases/poor ventilation; no exposure to work place hazards. Further, he can perform low-stress, unskilled work involving simple instructions, simple tasks, and simple decisions; cannot perform work at a production-rate pace involving conveyor belts or assembly lines; no work in large crowds or requiring interaction with the general public; and can adapt to occasional changes in work setting and work tasks.

(R. 23-35).

Case 5:19-cv-00243-JPB Document 23 Filed 11/24/20 Page 15 of 36 PageID #: 1299

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 24, 1980 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills of not material to the determination of disability because using the Medical-Vocational Rules as a framework supports the finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569.a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 10, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 23-35).

## VI.    DISCUSSION

### A. Standard of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th

Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contention of the Parties

Plaintiff, in his Brief, asserts that the Commissioner's decision "contains errors of law and is not supported by substantial evidence." (Appellant's Brief ECF No. 18 at 1-2). Specifically, Plaintiff alleges:

1.  The ALJ erred in evaluating whether Listing 12.06 was met or equaled (*Id*. at 10);

2.  The ALJ erred in failing to incorporate moderate limitations in concentration, persistence or pace into the hypothetical and residual functioning capacity ("RFC") and social deficits (*Id*. at 14);

3.  The ALJ erred in weighing the opinion evidence (Id. at 18);

4.  The ALJ's subjective symptom analysis is not supported by the record (*Id*. at 22).

Defendant, in his Memorandum in Support of the Motion for Summary Judgment, asserts that the decision is supported by substantial evidence and should be affirmed (ECF No. 21). Specifically, Defendant alleges that:

1.  Substantial evidence supports the ALJ's determination that Plaintiff did not satisfy the stringent requirements of Listing 12.06 (ECF No. 21 at 6).

2. Substantial evidence supports the ALJ's RFC assessment (*Id.* at 9).

3. Substantial evidence supports the ALJ's analysis of the medical opinions of record (*Id.* at 12).

4. Substantial evidence supports the ALJ's analysis of Plaintiff's subjective complaints (*Id.* at 14).

**C. Analysis of the Administrative Law Judge's Decision**

**1. ALJ Robinson's evaluation of whether Listing 12.06 had been met or equaled.**

ALJ Robinson concluded the record did not support a finding that the claimant had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. 24). Plaintiff alleges that the ALJ erred in evaluating whether Listing 12.06 had been met or equaled. (ECF No. 18 at 10).

**a. ALJ Robinson did not err in her determination that the criteria of Listing 12.06(B) had not been met.**

A claimant must meet the criteria of *both* 12.06(A) and (B) or *both* 12.06(A) and (C) in order to demonstrate a qualifying anxiety disorder. (20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.06). Paragraph (A) lists the necessary "medical criteria that must be present in your medical evidence" to substantiate the presence of a mental disorder. (20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00). The criteria in Paragraph (B) is used to evaluate how the mental disorder limits the claimant's functioning. (*Id*.) Paragraph (B) of 12.06 specifically requires the claimant's mental disorder satisfy the following criteria:

B.     Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

17

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

(20 CFR 404, subpt. P, app. 1 § 12.06). These four areas are evaluated on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation. (20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1200F). An extreme limitation occurs when a claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis. (*Id.*) A marked limitation occurs when a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." (*Id.*) A moderate limitation, which does not satisfy the requirements of Paragraph B, occurs when a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." (*Id.*)

The ALJ first considered whether the criteria of paragraph (B) had been met. (R. 26). The ALJ engaged in a thorough analysis of the above criteria, referencing many sources throughout the record to substantiate her findings. (R. 26). The ALJ found Plaintiff had moderate limitations in all four areas, including his ability to (1) understand, remember, or apply information;  (2) interact with others;  (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. (R. 26). Accordingly, the ALJ concluded that the Plaintiff did not satisfy the criteria of Paragraph B because he failed to establish at least two marked limitations or one extreme limitation.

Plaintiff alleges substantial evidence does support a finding that Listing 12.06(B) had been satisfied. (ECF No. 18 at 12). Plaintiff argues that Plaintiff's limitations in social functioning under §12.06(B)(2) and concentration, persistence or pace under §12.06(B)(3) constitute a "marked limitation" rather than the "moderate limitation" described by the ALJ. Additionally, Plaintiff

argues that the ALJ did not address probative evidence in the record and that the ALJ "incorrectly states that there was no support that he had frequent panic attacks." (ECF No. 18 at 12).

In the Commissioner's Brief in Support of His Motion for Summary Judgment (ECF No. 21), Defendant recites evidence of record that supports the ALJ's conclusion that the Plaintiff has a moderate limitation in the areas of understanding, remembering, or applying information; interacting with others; and concentration, persistence, and pace. Defendant argues that "the ALJ's 'Paragraph B' analysis for Listing 12.06 is sound, and should not be disturbed. The ALJ explained the basis for [her] conclusions, citing record evidence in support. Plaintiff's disagreements with the ALJ's interpretation of evidence does not necessitate remand, given the deferential standard of review applicable to the ALJ's fact-finding." (ECF No. 21 at 8).

As articulated above, the substantial evidence standard requires this Court to uphold the decision of the ALJ where such a decision is supported by substantial evidence. This Court must not substitute its own judgment. Throughout her analysis of the 12.06(B) criteria, the ALJ cites numerous medical reports in the record that contributed to her factual findings. (R. 26).

In finding that Plaintiff has a moderate limitation in interacting with others, the ALJ cited to the consultative examination in June 2017 where claimant was "mildly deficient in social functioning during the evaluation," (R. 26 *citing* R. 516), and to records where medical professionals repeatedly and on separate occasions described the claimant as "pleasant" and "cooperative." (R. 26 *citing* R. 501, 506, 509, 513, 575, 580, 587, 589, 592 and 1015). Elsewhere in the record, there is evidence that Plaintiff cohabitated with his girlfriend (R. 243), provided care to his son (R. 263), and frequently visited with relatives (R. 247, 266).

The Court would note that the ALJ's decision considers and cites to Plaintiff's own treating physician's notes from patient visits on May 24, 2017 and June 14, 2017 in support of Plaintiff's

pleasant and cooperative social interactions with medical professionals. (*See* R. 26 *citing* R. 506 and 509) Plaintiff relies on Dr. William Thomas's later opinion that Plaintiff had "marked limitations" in both social functioning and concentration, persistence or pace as reason supporting the reversal of the ALJ's decision. (ECF No. 18 at 12-13; R. 753). Dr. Thomas indicated this opinion by placing a checkmark in two boxes on a Mental Medical Assessment Form completed on June 4, 2018. (R. 753). It is appropriate for the ALJ to discount a treating physician's opinion if it is inconsistent with the record. (20 C.F.R 404.1527(c) and 416.927(c)). The ALJ noted an inconsistency between Dr. Thomas's later 2018 opinion and other evidence in the record regarding Plaintiff's limitations, and therefore, ALJ accorded this assessment little weight due to its inconsistence with the rest of the record. (R. 33).

Here, the ALJ's decision, finding that Listing 12.06(B) had not been satisfied, is supported by substantial evidence found within the record. Her thorough consideration of the record regarding 12.06(B) is articulated and cited within her decision. Therefore, the undersigned recommends the Court uphold the ALJ's decision that the claimant has not demonstrated impairments that meet or equal to the Listing 12.06(B) criteria required for a showing of disability.

### b. ALJ Robinson did not err in her analysis regarding whether the criteria of Listing 12.06(C) had been satisfied.

Alternatively, a claimant who meets or equals the criteria listed in both Paragraphs (A) and (C) may qualify as disabled under Listing 12.06. (20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.06). Paragraph (C) specifically requires a claimant to demonstrate the following:

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> > 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); *and*

2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

(20 CFR part 404, subpt. P, app. 1, § 12.06(C); *emphasis added*).

To be certain, Listing 12.06(C) is a two-pronged listing that requires a claimant satisfy the criteria of both § 12.06(C)(1) *and* 12.06(C)(2) in order to establish the qualifying mental impairment. Here, the ALJ found neither 12.06(C)(1) *nor* 12.06(C)(2) has been satisfied.

Plaintiff first alleges that the ALJ erred in finding that Listing 12.06(C)(1) had not been satisfied. (ECF No. 18 at 13). Plaintiff references the fact that he was once treated at the ER for anxiety. (ECF No. 18 at 13-14 citing R. 444, 453, 932-973). Plaintiff asserts that "the record reflects a highly structured setting; there is no evidence under 'C' that in order to satisfy the Listing, one needs intensive hospitalization or therapy."

Listing 12.00(D)(1) provides various examples of psychosocial supports and highly structed environments to be considered for the purposes of 12.00(C)(1). For example, one may "receive help from family members or other people who monitor your daily activities and help you to function," or "create[ ] a highly structured living environment by eliminating all by minimally necessary contact with world outside your living space." (20 CFR part 404, subpt. P, app. 1, § 12.00(D)(1)(a),(g)).

Plaintiff argues that he has created a highly structured environment in satisfaction of § 12.06(C)(1). Plaintiff asserts that he "does not socialize or leave the home unless for medical appointments[.]" He elaborates, "[s]tores are not his friends and he shops at night and with someone." (R. 508). Dr. Thomas found this portion of the Listing satisfied. (R. 753). Moreover, he argues (C)(1) is satisfied as he has evidence of mental treatment with the intent of diminishing

symptoms. (*See e.g.*, R. 506, 508-09, 575, 580). Most recently, he treated with Dr. Thomas for problems not wanting to leave the house. He had been staying to himself in his bedroom. Wellbutrin was added for depression. (R. 575-78);(ECF No. 18 at 13-14).

In response to Plaintiff's above argument, the Defendant argues that the ALJ explained that the record did not reflect that either prong of 12.06(C) had been satisfied. Defendant also stated that Plaintiff's argument rests upon Plaintiff's subjective complaints, and that those alone do not satisfy the criteria for Listing 12.06(C).

The Court would first note the Plaintiff is correct in his assessment that Listing 12.06(C) does not require "psychiatric hospitalization or other ongoing intensive mental health therapy[.]" (R. 27). While those may certainly be acceptable circumstances to meet the requirements of Listing 12.06(C), they are not required within the plain language of the Listing. The Social Security Administration explains that, in pertinent part:

> We will consider the effect of any treatment on your functioning when we evaluate your mental disorder. Treatment may include medication(s), psychotherapy, or other forms of intervention, which you receive in a doctor's office, during a hospitalization, or in a day program at a hospital or outpatient treatment program.

(See 12.00D4). Under the text of the language and based upon the record, it appears the Plaintiff had been receiving medical treatment in the form of medication.

However, an analysis of whether the ALJ misapplied the terms of the Listing is not necessary, as Listing 12.06(C) is a two-pronged Listing. Plaintiff must satisfy both (C)1 *and* (C)2 in order to satisfy the criteria for the Listing. Here, the ALJ also made a finding that the second prong of Listing 12.06(C) had not been satisfied. The Court defers to her judgment on the matter. Even if the Court were to determine that the ALJ made an error of law with respect to the first prong of the Listing – a finding which the Court is not making today – the error would prove

harmless as the second prong of the Listing would remain unsatisfied, thus failing to meet the standards of the Listing.

In finding that (C)(2) had not been satisfied, the ALJ referred to her discussion on whether "paragraph B" of the named Listing had been satisfied. As noted above, one of the categories used to determine whether the Listing can be met is whether the claimant has a marked or extreme limitation in his or her ability to "[a]dapt or manage oneself." (20 C.F.R 404, subpt. P, app. 1 § 12.06). The ALJ determined in that analysis that Plaintiff had only a moderate limitation in his ability to adapt or manage himself. The ALJ used this determination to arrive at her finding that Listing 12.06(C)(2) had not been satisfied.

The text of Listing 12.06(C)(2) would require Plaintiff to have "minimal capacity" to adapt to changes in his environment. While the ALJ did determine that Plaintiff has a moderate limitation in this area, that does not rise to the level of limitation to required to be considered to have "minimal capacity." Because the ALJ made this determination based on substantial evidence – as indicated by her consideration and incorporation of facts from the record into her decision – this Court finds that the ALJ did not err in her finding that Listing 12.06(C) had not been satisfied.

### 2. ALJ Robinson did not err in her Residual Functional Capacity (RFC) analysis.

A claimant's residual functional capacity is the "most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545. When assessing a claimant's RFC, the Social Security Ruling 96-8p, 61 Fed.Reg. 34,475 requires an ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). It is only after the function-by-function analysis has been completed that the RFC "may be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Mascio*, 780 F.3d at 636 (quoting SSR

96-8p). The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio*, 780 F.3d at 636 (citation omitted). A discussion of the functional limitations in broad terms followed by an in-depth analysis supporting the ALJ's function findings will satisfy the regulations requirement as well. See *Ashby v. Colvin*, 2015 WL 1481625, at *2 (S.D.W. Va. Mar. 31, 2015).

Here, the ALJ determined Plaintiff had the residual functioning capacity to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional push/pull and operate foot controls with the bilateral lower extremities; occasionally reach overhead; frequently handle and finger; occasionally climb ramps and stairs; never climb ladders/ropes/scaffolds; occasionally balance and stoop; never kneel, crouch, and crawl; occasional concentrated exposure to extreme heat/cold, wetness, humidity, vibration, fumes/odors/dusts/gases/poor ventilation; no exposure to work place hazards. Further, he can perform low-stress, unskilled work involving simple instructions, simple tasks, and simple decisions; cannot perform work at a production-rate pace involving conveyor belts or assembly lines; no work in large crowds or requiring interaction with the general public; and can adapt to occasional changes in work setting and work tasks.

(R. 27).

Plaintiff first argues that the ALJ erred in failing to incorporate moderate limitation in concentration, persistence or pace into the RFC. Plaintiff argues that the ALJ erred by failing to include "self-paced productions requirements" in the hypothetical posed to the vocational expert and that the ALJ failed to explain why she limited Plaintiff to "unskilled" work when the DDS reviewers, to which she had given great weight, found that Plaintiff had moderate limitations in maintaining attention and concentration. (ECF No. 18 at 15-16). Plaintiff also argues that the ALJ erred in failing to include a limitation for Plaintiff's math and speech deficits, as well as failing to include limitations for his social functioning deficits.

Defendant argues that the ALJ did address the issues raised by Plaintiff and adequately explained her reasoning for including or excluding certain limitations. Defendant also argues that the record supported the ALJ's exclusion of limitations regarding Plaintiff's math and speech deficits. (ECF No. 21 at 11-12).

The first point raised by Plaintiff is that the ALJ failed to adequately accommodate the Plaintiff's moderate limitations in concentration, persistence or pace, and also did not provide an adequate explanation for this decision. The case on which each party relies is *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In *Mascio*, an ALJ found that the claimant had moderate limitations in concentration, persistence or pace, but "the hypothetical said nothing about Mascio's mental limitations" and the ALJ's RFC finding included a limitation only for "unskilled work" without further articulation. *Id.* at 637-638. The court remanded in this case, holding that the ALJ could not simply ignore the claimant's moderate limitation in concentration, persistence or pace. *Id.* at 633. However, this remand is only appropriate when no explanation is given, making the rule subject to a case-by-case analysis.

In the present case, the ALJ included several limitations which took into consideration the Plaintiff's moderate limitations in concentration, persistence or pace. (R. 27). The ALJ explicitly stated that "[t]he following residual functional capacity assessment reflects the degree of limitation [the undersigned has] found in the 'paragraph B' mental functional analysis." (*Id.*) During the mental functional analysis, the ALJ explained her finding of a moderate limitation as to concentration, persistence or pace. (R. 26). She then incorporated this explanation into her RFC assessment.

Moreover, the ALJ explained why she did not include a limitation involving "self-paced production requirements" in the hypothetical posed to the vocational expert. Plaintiff argues that

this exclusion is inconsistent with the fact that she had given great weight to the DDS reviewers who recommended the above limitation. However, this is not the case. The ALJ expressly stated that the record did not support the assertion that the Plaintiff would exceed workplace tolerances for being off-task or absent from work. (R. 32). The ALJ further added a "production requirements" limitation in the RFC assessment, showing that she did consider Plaintiff's moderate limitation in concentration, persistence or pace.

The Court finds the ALJ took into consideration the Plaintiff's moderate limitations, incorporated those limitations into the RFC assessment, and explained why she did so, thus conforming to the rule set by *Mascio*.

The second point Plaintiff argues is that the ALJ erred by failing to add limitations that considered Plaintiff's math and speech deficits. (ECF No. 18 at 16). A consultative examiner had found that Plaintiff had an IQ of 79, and that spelling and math computation scores were significantly below what may be predicted. (R. 515). This Court finds that substantial evidence supports the ALJ's decision to exclude a limitation for Plaintiff's spelling and math deficits. First, Plaintiff reported that he could pay bills, handle a saving account, count change, and use a checkbook and money orders. (R. 246). Plaintiff testified at the Hearing that he was in the process of obtaining his GED online. (R. 47). Finally, Dr. Thomas, Plaintiff's treating physician, specifically reported that Plaintiff did not have a "low IQ or reduced intellectual functioning." (R. 752). While this evidence represents an inconsistency from Plaintiff's allegations, it nonetheless constitutes substantial evidence supporting the ALJ's decision to exclude any limitations concerning spelling or math.

Finally, Plaintiff alleges the ALJ erred by failing to include any limitations concerning his moderate social functioning limitations. (ECF No. 18 at 18). Plaintiff argues that even though the

ALJ included a limitation regarding large crowds, the ALJ erred by failing to explain how this is an effective limitation given the evidence that the panic attacks can be triggered by groups "of no more than five or six people." (*Id.*).

Defendant argues that no error occurred because the ALJ did include limitations regarding his social functioning, and also specifically found that the record did not support the assertion that Plaintiff suffered frequent blackouts and panic attacks. (R. 32). The Court is inclined to agree with Defendant. The ALJ included Plaintiff's social limitations in her RFC assessment:

> Further, he can perform low-stress, unskilled work involving simple instructions, simple tasks, and simple decisions; cannot perform work at a production-rate pace involving conveyor belts or assembly lines; *no work in large crowds or requiring interaction with the general public*; and can adapt to occasional changes in work setting and work tasks.

(R. 27; *emphasis added*). The ALJ's consideration of Plaintiff's social limitations is evidenced by the inclusion of the "no work in large crowds or interaction with the general public" limitation. As for an explanation regarding how that limitation is consistent with the evidence that the panic attacks are triggered by groups of five or six people, the ALJ explicitly stated that "[c]ontrary to Plaintiff's allegations, the medical evidence of record does not document frequent blackouts and panic attacks." (R. 32). This Court must defer to the ALJ in this instance. There is ample evidence in the record documenting Plaintiff's ability to interact with the general public and Plaintiff's psychological state and functioning with only a moderate limitation in social interactions. There is little to no documentation of the alleged panic attacks or blackouts. Because there is substantial evidence supporting the ALJ's determination, the Court will defer to the judgment of the ALJ on this matter.

### 3. ALJ Robinson did not err in the weighing of opinion evidence.

Plaintiff alleges that the ALJ erred the weighing of the opinion evidence in the record. (ECF No. 18 at 18). Plaintiff argues that the ALJ erred by violating the treating physician rule, citing *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987). In *Coffman*, the court held that a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence is present in the record to rebut the physician's opinion. (*Id.* at 617). Plaintiff also argues that the ALJ incorrectly weighed the factors listed in 20 CFR § 404.1527(c) when assigning weight to Dr. Thomas's medical opinion.

Plaintiff alleges that the factors support giving Dr. Thomas's opinion great weight. First, Plaintiff claims that Dr. Thomas is clearly his treating physician, having treated Plaintiff for over one year, and is also a specialist in Plaintiff's condition. (ECF No. 18 at 20). Plaintiff also argues that Dr. Thomas's reports are supported by the record, satisfying the consistency factor listed above. (*Id.* at 20-21).

Plaintiff also alleges that the ALJ erred by failing to provide an adequate explanation for her reasoning behind the weight given to Dr. Thomas's medical opinion. Plaintiff relies on *Monroe v. Colvin*, 826 F.3d 176 (4th Cir. 2016) in his argument. In *Monroe*, the Court held that because the ALJ did not specifically cite the "objective evidence" that contradicted the treating physician's medical opinion, the "analysis is incomplete and precludes meaningful review." (*Id.* at 191).

### A. The ALJ provided an adequate explanation for her findings.

This Court will first address Plaintiff's claim that the ALJ erred by failing to provide an adequate explanation to support her finding. Plaintiff references *Monroe v. Colvin*, 826 F.3d 176 (4th Cir. 2016) in his argument, but this Court finds *Sharp v. Colvin*, 660 Fed.Appx. 251 (4th Cir. 2016) more persuasive on this matter. In *Sharp*, the Plaintiff alleged that the ALJ erred by failing

to provide an adequate explanation for his findings, also citing *Monroe*. However, the court held that "[w]hile the ALJ did not cite specific pages in the record his explanation relied on and identified a particular category of evidence." (*Id.* at 257).

Here, like in *Sharp*, the Plaintiff alleges that the ALJ did not provide an adequate explanation for her finding. However, like in *Sharp*, the ALJ cited to specific categories of evidence. The ALJ in the present case was even more specific than the ALJ is *Sharp*, as she cited to specific locations in the record (R. 33). The ALJ cited to records 5F and 15F in the paragraph according Dr. Thomas little weight. The citation to 5F refers to the Emergency Room Records from Western Maryland Regional Medical Center between August 7, 2016, and May 9, 2017. (ECF No. 13-9). The citation to 15F refers to the Office Treatment Records from Family Medicine West of Knoxville between December 3, 2014, and July 1, 2016. (ECF No. 13-13). Here, the ALJ was more specific than the rule from *Sharp* required. Therefore, the Court finds that the ALJ did provide an adequate explanation for according Dr. Thomas's opinion little weight.

**B. The record presents persuasive evidence contradicting the treating physician's findings.**

Next, the Court will address Plaintiff's argument that the ALJ violating the treating physician rule set forth in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987). In *Coffman*, the Court held that the ALJ made a reversible error by ignoring the treating physician rule when no persuasive contradictory evidence was present in the record. (*Id.* at 518). In the present case, the Court finds that persuasive evidence contradicting Dr. Thomas's findings exists in the record.

In her decision, the ALJ extensively reviews the medical record in the case. The ALJ cited an examination in January 2015 that resulted, in part, in "normal neurological and psychiatric examinations." (R. 29). Following this reference, the ALJ cited sixteen other examinations that

were similar with the additions of "medication for diabetes, a referral to a cardiologist, and other medications for his back pain." (*Id.*). In the Adult Function Report dated May 2, 2017, Plaintiff himself stated that he could pay attention "as long as needed," directly contradicting the report that Plaintiff would be off task 25% of the time in the workplace. (R. 248). This Court finds this to be persuasive evidence contradicting Dr. Thomas's findings, so the ALJ did not err in according Dr. Thomas's medical opinion little weight.

**C. The ALJ adequately considered the factors provided in 20 CFR § 404.1527(c), and this Court will defer to her judgment.**

Finally, the Court will address Plaintiff's argument that the ALJ erred in failing to continue her analysis of the six factors, that the factors weigh in favor of according Dr. Thomas great weight, and that remand is warranted for the failure to explain why the DDS reviewers are given great weight. (ECF No. 18 at 20-21).

Pursuant to 20 CFR § 404.1527(c), the following six factors are to be considered in assigning weight to any medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the opinion. (20 CFR § 404.1527(c)).

Plaintiff argues that the ALJ erred by failing to continue the analysis required by 20 CFR § 404.1527(c) and that the factors weigh in favor for according Dr. Thomas's opinion great weight. First, the Court does not believe that the ALJ did not completely analyze the record in accordance with 20 CFR § 404.1527(c). Nothing in 20 CFR § 404.1527(c) suggests which factors should weigh heavier than others if the physician's opinion is not given controlling weight. Since the ALJ determined that controlling weight was not warranted in this case, the weight given to each factor was left to her judgment. After reviewing the ALJ's decision, it is quite clear that she found the

record to be very inconsistent the Dr. Thomas's opinion, given how many times she refers to the findings on mental health status examinations "minimal." (R. 33). Here, the ALJ did not err by failing to complete the 20 CFR § 404.1527(c) analysis, so the Court will defer to her judgment on the findings and will not engage in its own analysis of the record.

**D. The weight given to the DDS reviewer's opinions is consistent with the record.**

Plaintiff's last argument is that the ALJ erred in according the DDS reviewers' opinions with great weight. (ECF No. 18 at 21). First, Plaintiff argues that the ALJ's explanation for according Dr. Roman's opinion great weight was insufficient. Plaintiff claims that Dr. Roman did not have a review that provided "more comprehensive information," and that the ALJ failed to show Dr. Roman did. Plaintiff relies on the argument that Dr. Roman did not have the evidence of Frederick's inability to leave his home or ongoing panic attacks. However, it is the opinion of the Court that the record does not support either of those claims. In the Adult Function Report, Plaintiff not only reports that he can leave the house by himself, but details how and when he leaves the house. The evidence directly contradicts the assertion that he cannot leave his house. As for ongoing panic attacks, the ALJ made a finding that the record did not support frequent panic attacks. The ALJ did not make an error in affording Dr. Roman's opinion great weight.

As for the ALJ affording Dr. Reddy great weight, Plaintiff argues that Dr. Reddy's opinion regarding Plaintiff's condition was wrong because he did not have certain pieces of evidence. First, contrary to Plaintiff's claims, Dr. Reddy did have evidence of osteoarthritis, as Plaintiff had provided that information to the DDS examiners. (R. 117). Second, Plaintiff claims that Dr. Reddy's determination that Plaintiff could stand 6 hours per day and frequently lift ten pounds. Plaintiff here fails to show harm in this alleged error. None of the evidence that Dr. Reddy is alleged to have not been provided listed by Plaintiff in his Brief suggests that he would be unable

to lift ten pounds. Dr. Reddy also recommended that Plaintiff should never climb ladders/ropes/scaffolds and should never kneel, crouch, or crawl. The ALJ find these opinions consistent with the record – a record that contains all of the evidence mentioned by Plaintiff and which she thoroughly reviewed. Therefore, should any error have been made by the ALJ, the Plaintiff has failed to show any harm that resulted from the alleged error.

**4. Substantial evidence supports ALJ Robinson's subjective symptom analysis.**

Plaintiff alleges that the ALJ's subjective symptom analysis is not support by the record. (ECF No. 18 at 22). Plaintiff argues that the ALJ disregarded Plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of his symptoms. (*Id.*) Plaintiff states that "[t]he ALJ does not address limited daily activities, medication adjustments, the types of medications prescribed or how Frederick copes with pain or mental health symptoms; most of the SSR 16-3p factors." (*Id.*)

Defendant argues that the ALJ conducted a proper analysis of Plaintiff's subjective complaints that conformed to the governing regulations and was supports by substantial evidence. (ECF No. 21 at 14). Defendant claims that the credibility statements made by the ALJ are "virtually unreviewable" on appeal. (*Darvishian v. Green*, 404 F. App'x 822, 831 (4th Cir. 2010)).

The findings regarding Plaintiff's subjective symptoms require a credibility determination to be made by the ALJ. This Court's duty is to determine whether the record supports the ALJ's determination. Upon review, this Court finds that the ALJ's determination is supported by the record.

**A. The ALJ's decision regarding the intensity and persistence of claimant's subjective symptoms is supported by substantial evidence.**

32

The ALJ must engage in a two-step analysis in assessing a claimant's subjective symptoms. First, the ALJ must examine the objective medical evidence to determine whether the claimant's medically determinable impairments could reasonably produce his alleged symptoms. Then the ALJ must determine whether the claimant experiences those symptoms with an intensity and persistence that impacts his ability to work. (20 CFR § 404.1529; *Craig v. Chater*, 76 F.3d 585, 589 (4ᵗʰ Cir. 1996)). Here, the ALJ did engage in the two-step analysis. The ALJ listed all relevant objective evidence from the record. (R. 28-32). After this discussion of objective medical evidence, the ALJ made the following determination:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record *for the reasons explained in this decision*.

(R. 32; *emphasis added*). As stated, the ALJ had already given evidence from the record that conflicts with what Plaintiff alleges. Plaintiff argues that the ALJ disregarded Plaintiff's statements concerning his subjective symptoms without explanation. This is not the case. The ALJ gives several examples from the record that conflict with Plaintiff's allegations: "His thought processes were logical, and his mood and affect were appropriate, but he was anxious and restless." (R. 29). "Straight leg raise tests were negative bilaterally, and he had pleasant affect and mood with normal thought processes and content." (R. 30). "Eye contact was good, and he was cooperative. Mood was described as pretty good with congruent affect. His thought processes were linear and gold directed. His immediate, recent and remote memory were intact. His insight and judgment were fair." (*Id.*) "On examination, he was well groomed and in no apparent distress." (*Id.*). "On examination, his posture and gait were normal, and he had a positive attitude. He was cooperative, with good eye contact, and the length of his responses was adequate." (R. 31).

The above evidence from the record is just a part of the evidence referenced by the ALJ in making her determination regarding the Plaintiff's statements regarding his subjective symptoms. Ample evidence exists to support the ALJ's determination that Plaintiff's statements regarding his subjective symptoms were not consistent with the evidence from the record. Based upon the record, this Court finds that substantial evidence existed to support the ALJ's decision.

**B. The ALJ did address the claimant's daily activities.**

Lastly, Plaintiff argues that the ALJ erred by not addressing Plaintiff's limited daily activities, medication adjustments, the types of medications provided, or how Plaintiff copes with pain and mental health symptoms. (ECF No. 18 at 22). However, throughout her analysis, the ALJ noted when Plaintiff had been prescribed medications and when those medication prescriptions were altered. (R. 28-32). The ALJ also examined the evidence regarding Plaintiff's visits with pain management specialists and his mental health treatments in the forms of specialist visits and medication prescriptions. (R. 30-32). The Plaintiff asserts the ALJ does not discuss the impact of Plaintiff's daily activities. While this may be true, the Court is persuaded by the Defendant's argument regarding the issue.

The Defendant argues that even if the ALJ did not mention Plaintiff's daily activities, Plaintiff fails to establish the harm caused by this alleged error. (ECF No. 21 at 15). According to *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009), "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." In the present case, Plaintiff failed to establish that the daily activities would have impacted the ALJ's determination. As argued by Defendant, plenty of evidence exists in the record to determine that Plaintiff's daily activities were not as limited as alleged. "Plaintiff reported to the consultative examiner that he took care of his son, played with his son, made dinner, watched television with his mother, did his own laundry,

worked on his car, ran errands, drove, and went to church." (ECF No. 21 at 15, citing R. 516). Given that evidence from the record supports the ALJ's finding and that Plaintiff failed to show harm from the alleged error, the Court finds that the ALJ's subjective symptom analysis is supported by the record and should not be disturbed.

## VI. RECOMMENDED DECISION

For the reasons articulated above, the undersigned recommends the Defendant's Motion for Summary Judgment be **GRANTED**, and this matter be **DISMISSED WITH PREJUDICE.**

The parties shall have **fourteen (14) days** from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of _de novo_ review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

**Respectfully submitted November 24, 2020.**

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE